We have three cases that are scheduled before us for oral argument this morning. The first case, we actually have two cases that have been combined, so we make that four cases. Two cases have been consolidated for purposes of oral argument. So the first case is GrafTech v. Laird, No. 2015-1796-1797-1798. Mr. Dustin? Erin Dustin, sorry. Good morning, Your Honor. Good morning. May it please the Court. I understand you've reserved five minutes of your, you each have 20 minutes total time, and you reserved five for rebuttal, is that correct? That is correct. Okay, counsel, you may proceed. We are here today to discuss three different patents and three different IPRs. I'd like to start with case 1796, which involves the 520 patent. And there we have three issues that we think we need to address. We think both Laird and the Board fell into the hindsight trap with regard to obviousness. We also think there's an issue regarding the attributes of Mr. Bago, who is Laird's declarant. And then we also think some missteps occurred with regard to GrafTech's evidence of commercial success. Ms. Dunstan, I want to cut, since these things are combined, I want to cut to the chase on your second set. And that is on 39-48 of your opening brief in 1797-98, you appear to raise several claim construction arguments that you didn't present to the PTAB. From what I gather, the only argument you made appears on page 1160 of JA 1797. And I'm going to quote you the argument. The disclosure of the 874 patent demonstrates that thermal shielding is protection of a portion of the device, other than the heat source itself, from the heat generated by a heat source. What do you mean by disclosure? Did you mean to say the specification? Yes, we think the specification makes very clear the distinction between shielding and dissipation. So disclosure, you mean the specification of the 874 patent? Yes. Okay. Why haven't you waived the other claim construction arguments that appear in your opening brief in those cases? Where did you raise them? We think we raised them. Can you repeat your question as to whether we waived them in our underlying patent owner response? Is that what you're referring to? Yeah. I'm saying that what you presented to the PTAB, yes. Okay. I think at the PTAB we presented a number of arguments that support our construction. We pointed to the specification, the claims, and certainly the evidence from Dr. Cullum. 1797. Go ahead. Here I go. As you mentioned, on page 19 of our patent owner response, which is in the appeal appendix at A1160, we talked about, as you mentioned, the disclosure of the 874 patent. We specifically cited column 3, lines 61 to 64, as well as column 5, lines 14 to 17. And we also referred to the expert declaration of Dr. Cullum and paragraph 137 of that declaration. And I think what happened here is the board has confused two fundamentally different aspects of thermal management. There is a great distinction between thermal shielding and thermal dissipation. And a real world example of this could be if you happen to get a very hot cup of coffee this morning, it may have been given to you with a sleeve around it, perhaps a cardboard sleeve. That sleeve is designed to protect your hand from the heat that the coffee would otherwise transmit to you. In that capacity, the sleeve is acting as a shield. If, however, that sleeve were made out of copper or something that was thermally conductive, it would act as a dissipator and it would want to move and get rid of that heat. And your hand would get extremely hot and it would not help at all. And in that case, it would be a dissipator. So if we think of the cardboard sleeve acting as a shield, it is focused on protecting something other than the heat generated from the heat source. It wanted to protect your hand. Whereas with the copper dissipator, it would want to move the heat and it would care about the heat from the heat source. So we think that fundamental distinction between the two, and they are often mutually exclusive, we think that shows why our definition, which is protection of a region of a device other than the heat source itself, from heat generated by a heat source, is appropriate. The board's definition is simply a structure that protects against heat. Now, at least as of today, we appreciate that the claims must be construed in terms of their broadest reasonable construction. But even this court recently on April 19th in the in-ray man-machine interface text case, mentioned how even the broadest reasonable interpretation cannot be that. Shielding against heat and dissipating heat, why is that not protecting against heat? Well, it may be, but that definition is so broad it encompasses just about everything. And it would remove the distinction between the two. And if you look, for example, at Claim 1 or Claim 11 of the 874 patent, the preamble talks about a thermal dissipation and shielding system. If those things meant the same thing, there would be no need for this latter part of the clause. And those of ordinary skill in the art appreciate that there's a tremendous difference between shielding and dissipation. And the credible evidence of record from Dr. Cullen walks through that in detail. And we think, again, the definition proposed by the board is simply too broad. Under that definition, a structure that protects against heat, it covers almost anything. Let me take you back to the record again. I'm looking at page 1160 of the record in 1797. Unfortunately, I had your records on appeal scrambled between the two cases. Where you argue claim construction of thermal shielding. What I quoted to you appears to be the only argument you make about claim construction of thermal shielding. To the P tab. Are you there in the record? Can you repeat the A page that you're at, Your Honor? 1160. I'm there, Your Honor. See where it says thermal shielding? Yes. It appears to me that what I quoted to you is the core of your only construction argument. The disclosure of the 874 patent demonstrates that it's thermal shielding. And you told me disclosure meant specification. Is protection of a portion of the device other than the heat source itself from the heat generated by a heat source. See what I'm talking about? I do. Isn't that the core of your argument there? That is the core of the argument. Okay. And what I'm comparing it with is pages 39 to 48 of your blue brief in that portion of your appeal. In which you raise a number of arguments which do not appear to have been raised to the P tab. A number of claim construction arguments. And that's why I'm asking that question. Haven't you waived those other than the argument you made to the P tab? I believe we have not waived those, Your Honor. And immediately before the sentence that you referred to, there is a reference to Exhibit 2005, paragraphs 132 to 137. Right. And in that stretch, Exhibit 2005 was the expert declaration of Dr. Cullum. And those paragraphs are found in the appendix at A1414 through A1415. And that goes through the expert testimony and the reasons why we have construed thermal shielding in this manner. So you've incorporated that by reference in your argument? Absolutely. And Dr. Cullum walks through specific portions of the 874 patent, including the abstract aspects of the specification on Column 3, Lines 61 to 64, also Column 5. And in view of all of this, he concludes and supports the definition advanced by Graftec. Also, of course, claim construction is a legal determination. It's a de novo determination. The underlying facts are reviewed for substantial evidence. But we have to keep that in mind as well. Let's go back to what we were talking about. When you're talking about dissipation and shielding of heat, it seems to me that there's overlap there and that that's an inherent property of graphite. You seem to want to pull apart those two different functions. But isn't that the same function, dissipating heat and shielding against heat? No, it depends very much on the attributes of the substance and it depends very, very much on the confirmation of the system. But that's an inherent attribute of graphite. I do not believe so, Your Honor. There are many, many different types of graphite. And these particular patents reference compressed particles of exfoliated graphite. So that is a subset of graphite. And graphite is an anisotropic material. It does have different conductivities and different orientations. But simply having a different thermal conductivity in, for example, the A direction versus the C does not mean that it will necessarily both shield and spread. Again, it depends on the configuration of the system. And that's why in both the 874 and 441 patents, it's not simply directed to the sheet of the CPEG. It has to be in a particular confirmation. So once again, why isn't dissipation and the shielding, why isn't that protection from the heat? If you're seeking to dissipate heat and then to shield it, and the PTAS says, well, what you're doing is you're protecting, why isn't that the correct instruction? Because it would literally erase the distinction between the two things. And as both Dr. Zwiebel and Dr. Cullum were relevant to this inquiry, has talked about, you know, they're basically night and day. If you think of, you know, similar to the coffee cup, if you think of the space shuttle, you want to shield the heat as they reenter the atmosphere. You want to protect what's inside. You don't care about the heat source. You want to protect what's in there. Whereas if you wanted to dissipate heat, you actually are concerned about the heat source. You want to take that heat in and move it. So completely different functions, completely different focuses. And I think to say simply protects against heat. You're going to lose me on that hypothetical. Okay. Because if I'm sitting inside the space shuttle and I have graphite on the bottom of the space shuttle and I'm entering the atmosphere of the Earth, why does it matter to me if the graphite is shielding against the heat or taking it in and dispersing it away from me? You would need to make sure that you had not only a substance but a confirmation that would block the heat, such that its through-plane conductivity was really low, that it kept the heat outside of the shuttle. If you had a substance in a different orientation or confirmation that permitted the conductivity through the space shuttle, the heat would get inside. You're arguing here, I believe, that the board seemed to misunderstand the meaning of these claim terms. I mean, it seemed to me that the board clearly understood the difference between thermal dissipation and thermal shielding, right? I don't think so, because if they did, I don't… Let's say thermal dissipation is spreading heat from a heat source, which sounds like what dissipation is, and thermal shielding is a structure that protects against heat. What I'm trying to get at is what are the consequences of this error? I mean, does it mean that they looked at the wrong prior art? Assume, for purposes you're right, that there is a difference here that wasn't understood by someone. Where does it bite? Okay. Two things. When the board says simply a structure that protects against heat, the question is, which heat? Where does it come from? What are they concerned about? In terms of the practical effect… What's that got to do with not perhaps understanding the distinction between shielding and dissipating? The practical application of that is all of the instituted bases of obviousness rely upon a core of three publications, Norley, Tseng 520, and Mercury. Now, because they have merged the concepts of dissipation and shielding, they have considered the Norley publication as one directed to shielding, and that's simply not the case. You need look no further than the title, which is, quote, The Development of a Natural Graphite Heat Spreader. Heat spreader is a synonym for dissipation. It has nothing to do with shielding. Similarly, the Tseng 520 patent is directed to a dissipator or a spreader, but again, the board has, under this extremely broad definition, interpreted it to be basically a shield, and we think that is technically inaccurate. When you add Mercury, the entire device is a shielding device. It happens to reference CPEG, but as used in that publication, it too is used as a dissipator or a spreader. So we think not only have they combined publications that they would not normally have, they have put attributes on these publications that one of ordinary skill in the art, and certainly based upon the expert testimony, simply cannot be combined to arrive at the claims of the 874 or the 441 patent. Can you address real quickly your argument regarding commercial success? Yes. So for the 520 patent, that's directed to thermal management systems, 874 dissipation and shielding systems. We relied upon evidence from Mr. Green, an expert with regard to valuation, as well as some information from Graph Tech, and we believe that we showed commercial success by two primary things. Mr. Green concluded that products manufactured and sold by Graph Tech that enable the use in consumer electronic products of the systems embodied by the claims are commercially successful, as are those ultimate products. And the board said there wasn't any specific nexus shown, correct? That's what they said. Isn't that the hill you've got to climb up and conquer? What's the specific evidence of nexus to any particular device that you pointed to? Both experts in all three cases walked through the attributes of the claims and made sure through teardowns that particular products, such as an iPhone, a tablet, a laptop, et cetera, literally embodied or satisfied the limitations of the claims. And while it's not evidence, we think a demonstrative use below is. With the commercial success, what can you point to evidence that shows that the commercial success of the iPhone is tied to having this particular material in the iPhone? We think we established a prima facie case of commercial success because we showed that the Graph Tech spreader shield material is commercially successful, as are the products that embody it. You think as a result of making your prima facie case, the burden shifted to someone else? We do. Under the Ecolochem case, the Rambis v. Ray case, and the Damaco case, we think we made out a sufficient prima facie showing. That then shifts the burden to Larry. What's the basis for the prima facie case? When you say, for example, I got this iPhone here and somebody bought it and you're just assuming that one of the reasons why they bought it was because it doesn't get hot in your hand? I don't think it's an assumption, and we had a number of different devices. Who testified? Whose affidavit did you have that said, guess what, the main reason why I bought the iPhone is because it doesn't make my hand hot because this stuff is in it? We did not have evidence of that, but actually we believe that was Laird's burden. How do you get a prima facie case going without something to that effect? Well, I think two things. Keep in mind that... Attorney argument. You've got to agree with me. Attorney argument wouldn't be enough to ground a prima facie case, right? Correct. We would need to rely upon the information from Mr. Green as well as the underlying exhibits and the underlying financial data. What I think the board was looking for was that data point that's beyond attorney argument, short of conclusive evidence, right? And was looking for that and couldn't find it. And to be honest with you, that's what I'm looking for. Okay. And I couldn't find it. And they also distinguished the commercially successful products as possessing the Graph Tech products used in those as possessing a higher thermal conductivity than that disclosed by the disputed claims of 520, right? Yes. Thank you for bringing that up. And that's one important distinction among the three IPRs. In the 520 case, it appears as they completely dismissed the commercial success evidence because they thought there was an inconsistency of thermal conductivities between the evidence submitted and that set forth in the Graph Oil Manual. On that point, the Graph Oil Manual has a copyright date of 1987. As of that time, CPEG only reached a thermal in-plane conductivity of 140. That's all it was. So the way I understand your argument, and I found it very interesting, if I'm correct, and that is that what the PTAB did, the nexus they were drawing or that they drew, was from the prior art and the evidence you submitted on commercial success instead of the evidence you submitted on commercial success to the claims. Is that correct? That's correct. And also, with regard to commercial success, it has to be of the patented invention. So by definition, it must be after issuance of the 520 patent. So we had modern evidence regarding commercial success. So modern CPEG has achieved much higher in-plane thermal conductivities. In about 2004, 2005, we got up to 300. Then we moved to 450. Then we're as high as 600. So in the products that were referenced in the declaration of Mr. Kramer, that is modern conductivity. Somehow, some way, the board didn't appreciate the distinction in time, and they said, oh, well, you're saying 300 over here, but the manual says 140. We're not going to look at any of this, at least in the 520 case. In the 874 and 441 case, I think there's two things to consider. Graphtec does not sell end-user products. So with regard to commercial success, we need to look at how much of this material they sell to the people who then sell to Apple, who then sell to Kindle, who then make it into the laptops. And I think the data is quite substantial on that, and this is highlighted at pages 47 through 54 of our opening brief. You're well into over time. Okay. And I'll restore some of your time when you come back up, all right? Thank you. Thanks. Mr. Cutler? Would you address the issue of commercial success that we were just talking about? Absolutely, Your Honor. On the commercial success issue, now would you agree that if the PTAB drew or attempted to draw the nexus regarding objective indicia of commercial success from the evidence of the indicia to prior art as opposed to from the evidence of indicia of the nexus going to the claims, that that would have been error? No, here's what happened. Here's my reading of what the board did. But that would be error, correct? That would be error if they did that. Okay. But it would be harmless error in this particular case, first of all. Secondly, I don't think that's what happened. Okay. What happened here is when you look at the discussion of the prior art, what GravTech stated in its patent owner response, and it's referenced by the board in its decision at 831. What GravTech said was, and it's a footnote 7. Which decision? I'm sorry, that's a good point. It's 831 of the 1796 appeal. Judge Grossman's got 831? 831, Your Honor, and it's footnote 7. So what the board said here, and what they quoted from GravTech's patent owner response is that they're talking about that the particular type of graphite in the graphoil manual, and this is the key, the italicized words from the board, and claimed in the 520 patent. So at this point in time, what GravTech is saying is, hey, CPEG, which was back in 1968, was first disclosed in the Shane patent, all the way through, and what's claimed in the 520 is 140 watts per meter Kelvin. Then in their commercial success argument, they bring up CPEG again, and they talk about the fact that it's 500, 600, et cetera, high levels of thermal conductivity. Now, what was just alluded to here by my colleague was that, well, in fact, I wrote it down, the quote was, the board did not appreciate the distinction in time between the 140 stuff and what that thermal conductivity was back in the prior art, and what happened in modern, what they started calling modern evidence here in this appeal. The reason they didn't appreciate it is because nobody told them. The only time this issue came up was in the oral argument, and this is referenced in the briefing by GravTech. In their appeal brief, they cite, at page 50 to 51, Ms. Dunstan's testimony at the oral argument, talking about how as time progresses, the process gets refined, et cetera. That's the only indication where this time thing came up. So the board is sitting there saying, CPEG has been CPEG since 1968, and I don't know what this thermal, the GravTech threshold, which we didn't talk about in the outset, I don't know what that is. And there's a lot of confusion, and the point is that the confusion was engendered in the patent on response when they said that the claimed CPEG is 140, but then CPEG ends up having a higher thermal conductivity later on. The board was able to throw its hands up, because if they wanted to prove this point, they didn't do the job that they needed to to prove the point, because they didn't talk about this time distinction. That only came up in the oral argument at the very end of the case in that testimony by Ms. Dunstan. So I think the board was well within its right, it was reasonable. But I don't see that the claims claim any type of thermal conductivity. They have a specific number, conductivity. So why is thermal conductivity even relevant to this issue? Well, it is because in the... See, you're arguing the prior art as well. But the claims themselves don't claim a certain... It's not a requirement, is it? No, absolutely not. Well, here's why this all became confusing, is because if you look at the 520 patent, which is the case I was just reading from, the 1796, GravTech generates what we're talking about in the brief as the GravTech threshold, saying that the Inouye reference would not have been combined with GrafOil because of some fictitious... They made it up, 500 watts per meter Kelvin threshold. You may remember that. So on the one hand, we're talking about, well, you wouldn't combine because... And that's where that quote comes from that I read, that the GrafOil manual, the graphite from the GrafOil manual, and the graphite claimed in the 520 patent, 520 patent slash CPEG is how they described it. So that's all below 500. But then all of a sudden we get evidence that there's CPEG above 500, 600. And the point was the confusion that was engendered by their argument, the board threw its hands up and said, the threshold's illusory and not something that we are going to acknowledge, and your commercial success evidence is contradictory and not something we're going to acknowledge. That's why this came about. It's not in the claims. We don't claim it's in the claims. The whole issue came up because of their GravTech threshold argument that they were trying to make. And the confusion was born by them. It was their burden to try to persuade the board that this was an issue, and they did a bad job of it. Going more specifically to the commercial success argument, initially, and there's some criticism about whether the board properly addressed the commercial success. In the board's decision, explicitly the board said it considered all the evidence and it found that there was no nexus. Now, you have to realize the context of this. You can probably get a flavor of it because of how thick the appendices are that are before you right now. In one case, it's about 5,000 pages. In another case, it's about 6,000 pages. In the underlying IPR, I mean, the stack of paper on my desk is probably 8 or 12 inches tall of all this commercial success evidence, industry praise and copying and commercial success, et cetera, et cetera. I mean, industry praise stuff, for example, I'll give you an example. One of the industry praise arguments was a governor's award. There's a governor's award and that's industry praise of these patents is what was told to us. Isn't the nexus the only issue that's on appeal? It is. I'm trying to give you an example of why the board's decision is absolutely justified on that point. And the reason is… I understood the patentee to be only challenging the nexus holding. That's correct, under commercial success. Yes. That's right. But Graftik is also challenging the sufficiency of the board's decision and whether the board did a good enough job in explaining what are the reasons why they denied the nexus argument. And what I'm trying to explain is that, for example, this industry award… I didn't see that argument in your brief. I didn't see you saying that even if we agreed that the board messed up on nexus, we nonetheless affirmed because they were correct on copying and the other issues. That's not the area. What I'm trying to do is give you context. I don't really understand why you're using your time to talk about it. Well, because when we're facing this argument that the board didn't do a good enough job explaining itself, I think it's important for you to get the context from the appendix that it is not reasonable to expect the board to go through every one of these pieces of evidence that was put before it. It's an insurmountable burden for the board to undertake. It articulated its reasons why.  And that's sufficient. So I was addressing that point. But looking at the three things. So they discarded everything else. I know there's a difference between the graph oil that exists as of years after the patent issue compared to the graph oil that existed when the claims were being processed, right? I missed the very first part of that question. The graph oil, the material had different characteristics at an earlier point in time than it did at the later point. That evidence is out of record, Your Honor. Excuse me? That evidence is out of record, Your Honor. What's of record is graph oil manual, the 520 patent, the statement by Graph Tech that those are basically the same thing. We have some later, some commercial success data that talks about some other types of spreader shield, other sorts of graphite. But we have nothing that talks about, well, this old stuff wasn't available back then. It's different in some way, shape, or form from the prior art. That I'm not aware is available. All that we have, all that's cited to in the briefing in this appeal by Graph Tech is that statement on page 51 of the brief, of their opening brief in the 1796 case that says that, you know, that's Ms. Dunstan's testimony about how this stuff changed over time. There's no evidence of it that I'm aware of. So the rate of conductivity is not at issue? The range of conductivity is not at issue. I mean, they make it an issue relative to the board. The board made it an issue. Absolutely. But the board. Where in the claim, then, does it refer to any type of range or rate of conductivity? It does not. It does not. Well, then how can the board say that they failed to draw a nexus between commercial success and the claim? What the board said was that Graph Tech contradicted itself. And therefore, its evidence was given less weight, is what the board basically found. They make certain statements in one context in terms of what the Graph Tech threshold means, and they made different statements in a different context. And what the board said is, we're throwing our hands up here. We're not giving that persuasive weight because it's contradictory evidence. That's what the board said. But the bottom line is, regardless of what the board did there, when you look at what the commercial success evidence is, what it's pared down to on appeal are three things. Number one is the iPhone, Kindle sales, et cetera. Number two is Ross data about SpreaderShield. And number three are a series of 11 licenses. None of these show the required nexus.  nexus. And the reason why is in the evidence that was before it. You heard my conversation with your adversary about her view about a prima facie case of nexus? That's right. And what do you have to say about that? Somehow we've jumped over proving commercial success. So with the Crocs case, which was emphasized in the briefing, there were some other cases that were cited here today. Crocs wasn't mentioned. But in the Crocs case, what it says is that the burden is initially on Graph Tech to show commercial success, quote-unquote commercial success, and the link between that commercial success and the invention. Crocs says that when that's established, the burden will shift to the adversary to prove that maybe that commercial success is attributable to, I don't know, advertising or other market forces. Crocs doesn't wipe away the extensive jurisprudence of this court that sets forth what is required to meet that threshold of commercial success. Their argument begs the question of whether they've proven commercial success in the first place. Now, what we provided to the board, and the board stated that it considered, was a lot. Their stack of commercial success was tall. Our response is true. Your argument is that she's misusing the concept of your adversary about prima facie case. Absolutely. When you look at the underlying facts, you can't just throw raw numbers out and say, hey, I sold a bunch of stuff to the iPhone, when there's no evidence, as Your Honor pointed out. There's no evidence that the iPhone was sold for that reason. Absolutely right. We cited evidence, a Thomson Reuters report, that shows the top patents that are embodied in the iPhone. There's over 1,000 patents that embody the iPhone. It's not going to surprise you. This patent is nowhere to be found. We had an expert that testified that, guess what, no rational consumer is buying the iPhone because of the graph oil that's in there. All right? The raw numbers of what was sold to these various companies. Is it your position that the absence of evidence on Nexus is sufficient alone to undermine the secondary considerations argument? We don't really care what the level of conductivity may or may not have been in the product. I agree with that wholeheartedly, yes. You need to have a fundamental showing of that commercial success and the Nexus. Both are required under this explicit test of Crocs. You have to show both, and then if you show that, then we have the burden of coming forth and saying, hey, these are the reasons why that success that you did show is due to something else. What I heard my colleague suggest was that that burden shifts almost immediately. I get to throw some numbers on the table, and now me, as the challenger, has to go out and develop all the contrary evidence to just some raw numbers, and that's not the law of this court. Well, the implicit core of their argument seems to be that the iPhone wouldn't work as promised without our product. But there's nothing in there that, and that's not squarely articulated, but there's also nothing I could find in the record that shows that. You're exactly right, Your Honor, and the second thing is we did provide context to say that there's tens of thousands of electronic devices nowadays, and there's lots and lots of heat management devices out there. That's the key. I've got a few minutes left unless there's more questions. I'd like to turn to the only legal issue really in the case, which is the claim construction argument from the 874 and 441 patents. And I just think that what we heard earlier was a – Talk about the waiver question I asked. Your Honor, I raised that issue in our briefing. I know you did. And I believe that you're correct. I believe that we dealt with 10 or 14 lines of text in the patent response, and all of a sudden 10 pages shows up. Now, we responded to all that. I believe that even if they're allowed to have that in, we responded. But I agree wholeheartedly that that's been waived. You know, I think there's an incomplete discussion of the Board's decision. And this discussion about how the Board somehow confused thermal shielding and thermal dissipation is just wrong. Judge Clevenger, you went through some of the claim constructions that the Board came up with. Thermal dissipation is spreading of heat. Thermal dissipation is blocking of heat or protecting from heat. And they also talked about the fact that they defined the exact phrase from the 22, the thermal dissipation and shielding system, defining that as a system that both dissipates and shields heat. That's exactly what their invention does. It simultaneously dissipates and shields heat. But the ironic thing is, all the prior art that we cite and all the prior art that was used to defeat their claims, it's the exact same CPEG. It's CPEG all the way through. The inherent characteristics of the property demonstrate both characteristics. Absolutely correct, Your Honor. Not just inherently, Your Honor. And by the way you compose the property, you have more conductivity or more release. Absolutely right. That's right. And when you're dealing with the same product. You can build the product to satisfy which of the two directions you're trying to move the heat in. And that's exactly what Norley says. The prior art says the advantage of this anisotropic, and what I was going to clarify briefly in what you said was, it's not just inherently shown, it's explicitly shown. When the anisotropy of these products is considered, that is it moves very fast in the A and B plane but very slow through, you know that's the shielding right there. We showed at page 4 and page 15 of our brief an amputated version of a figure from the 520 patent that had the sheet and the device here. If the heat is moving this way, by definition, it's shielding the second component above it. And that's exactly what the court found, the board found I should say. But I do want to point out that even if they were correct, it's irrelevant. The claims themselves explicitly already require that you're protecting another component other than the heat source. Every single claim in both of these patents where this claim dispute has arisen requires either protection of the external surface or the protection of a secondary component. And the prior art shows that. In fact, what the board said was that the Norley and 520 patent necessarily disclosed shielding. You know, stated in another way what they articulated that if CPEG is shielding any electronic devices of the 874 and 441 patent, it was shielding back in 1968 with Shane, it was shielding in the 520 and it was shielding in Norley. Can I ask you a question on the 103 analysis to give your adversary an opportunity to respond because she didn't raise it when she was up first? A key piece of their argument, your adversary's argument on the 441 and the 474 IPRs is that mercury is not analogous art. If we can knock mercury out, then one leg of the stool falls away on the 103 analysis. Tell me why you think mercury is analogous art. Okay. Mercury is a patent that is owned by the same company, the patent owner here in this case. I don't think it's owned by the same company. Okay. That doesn't make it analogous art. Mercury also employs the exact same material, CPEG, and I think that really It's in a different field. It's a different field. It's used in the industrial. I saw what the different fields are. So in the mercury patent, it's more of an industrial field. In fact, if you look at the patents, there's a flame underneath it. And what that patent does include is a piece of metal in between the flame and the graphite to protect the graphite from the flame. But I think Council has the argument exactly backwards. If we're talking about graphite works in the incredible heat of an industrial application, then it's almost a teaching towards using that in the lower heat of an electronic device. You've got Norley saying CPEG. Maybe it has some specific property that only gets activated under the high heat. There is not. There is not. It's the same stuff. There's absolutely no property of CPEG that changes somehow under the high heat. It is the exact same material in Norley in the 520 patent. And what the board said is, and by the way, we think shielding is shown in Norley in 520, but just to be sure, we're going to take the teaching from Mercury, which at column four lines 42 to 46 says that CPEG is, quote, known to be a good thermal barrier. 51 to 54 are the same column. CPEG is, quote, employed in high temperature shielding applications. The board said, if you don't believe that it's in Norley and 520, we think it is because if you look at the anisotropic properties, but we'll pull Mercury in as well and show you that this is known to shield explicitly. So that's why the argument is wrong. And this, of course, is a substantial evidence question as well. There's no doubt that the board had sufficient evidence to rely upon to find that this fact issue is decided in our client's favor. I only have a few more seconds. If you have any questions, I'm happy to address it, otherwise I'll. I think we have your order. Thank you very much. All right. With my time remaining, I'd like to clarify a few things. I believe it was just. I'm going to restore you back to three minutes, okay? Pardon? Three minutes. Three. Okay. At no point has Graph Tech ever alleged that the claims of the 520 patents or any of the three patents require a particular thermal conductivity. I think it was just mentioned that somehow we've made an argument that CPEG was 140. I don't understand that argument, and I would invite consideration of our patent owner response. I think at no point in there did we say that the claims required a particular thermal conductivity. I do not think that we created this confusion. We made very clear that when deciding obviousness, you must go back in time to before the invention. So we are locked in time before February 25, 2000. So any consideration of modern evidence is improper. Also, I think the board pulled in the invention itself when making the decision, and that, too, is improper under the case law. With regard to commercial success, I would like to mention a few things. At times, it's been indicated that the nexus has not been shown. I think if we look at the record, and we were faulted, perhaps, for having a voluminous record, but we consider it important to be thorough. If you look to A4. We've seen taller stacks than this. If you look to A4619, that is a demonstrative we used at the final hearing, and it's a good snapshot. It's a good summary of the evidence of commercial success. It, by itself, is not evidence, and we appreciate that. But it sets forth how each of the three claims, the claims of those patents are embodied in particular devices. And so I think the nexus has been shown because our experts have walked through, gone through the teardowns, and shown that these products embody or practice the claimed invention. That nexus was shown. And we have shown, in our brief, the numerical value of the product. Well, what happens if you have a product that practices a particular invention, but it is agreed by everyone that no one ever purchased a Well, I think we. So you have evidence that, yes, indeed, the phone includes some wiring that is covered by the 003 Clevenger patent. But there's absolutely, everyone agrees that no one ever, no commercial success of that product is in any way connected to the fact that the Clevenger patent is represented in the product. It includes, right? I think not. It would depend on the evidence of record. And I think the key is, to date, the case law indicates that to establish a prima facie case, you've got to show two things. Well, what is this prima facie case? Have you got a case you can tell me about from our jurisprudence where we talk about a prima facie case? Yes. One is the Damaco case, which is 851F2D1387. The second is the Ecolachem case, 227F3D1361. And I'm looking now at page 1392 of the Damaco case. And they say, a prima facie case of nexus is generally made out when the patentee shows both that there is commercial success and that the thing, product, or method that is commercially successful is the invention disclosed and claimed in the patent. So here we've shown commercial success. We've shown the amount of product that Graphtec has sold. We've also shown the commercial success. Commercial success and the thing that is successful. Yes. And we have shown the success of the ultimate products, not only our material that we sell to the vendors, but the products that the vendor sells. We think, under the case law, that shifted the burden to Laird. And the Damaco case on page 1393 says, once you've set that forth, the burden of coming forward with evidence and rebuttal shifts to the challenger. And basically they say. Read the rest of that phrase. The thing that is successful is. Is the invention disclosed and claimed in the patent. Which is the iPhone. It's an iPhone. It's a Kindle tablet. It's two laptops. The iPhone is disclosed in the patent. We do not claim. And the answer to that is, of course, no. I disagree. We are thermal dissipation and shielding systems with a particular configuration or a thermal dissipation system. And those claims read on. Those devices are configured in such a way as to satisfy the limitations of those claims. So we believe once the nexus has been established, you shift the burden. And it could be due to marketing. It could be due to advertising. It could be due to all sorts of things. But they say in that case it's the challenger's burden to show that that was what was responsible. Now if you look at the report of Dr. Feinberg, advanced by Laird, he does not have an opinion on these issues. He simply took issue with what Mr. Green did. He didn't like his methodology or exactly how he went about it. But he admitted in his deposition that he did not have an independent opinion on this. And he did not do that analysis. And this is set forth with particularity in our reply at page 31. Could you give us your concluding thought? I think timing is essential when deciding these matters. We have to go back to before the invention. I think we have to let the specifications control and make sure that we don't get too divorced from the specification. And I think we really have to make a distinction between attorney argument and credible evidence of record. Thank you very much. Thank you.